UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | 1:09CR271-1 |
| | ) | |
| | ) | |
| RANDOLPH LEIF KILFOIL | ) | |

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge

Before the court is the motion of Defendant Randolph Leif Kilfoil ("Kilfoil") to suppress a Ruger 9mm semiautomatic handgun, model P-85, and any other evidence seized as a result of his arrest on May 13, 2009. (Doc. 9.) The motion has been fully briefed, and the court held a hearing on November 3, 2009. For the reasons set forth below, the motion is denied.

**I.  BACKGROUND**

The Government presented the testimony of Greensboro (North Carolina) Police Department ("GPD") officers Roman Watkins ("Watkins"), Ron Sizemore ("Sizemore"), and Eric Sigmon ("Sigmon"), eleven-, twenty-five-, and thirteen-year veterans in law enforcement, respectively. At the time of Kilfoil's arrest, all three officers worked with the GPD street gang unit. The court credits their testimony, which it finds credible, and finds the following facts.

1

The Latin Kings is a street gang that traces its presence in the United States to approximately 1940 and is estimated to have 12,000 members in thirty-four states today. Approximately forty to fifty members live in the Greensboro, North Carolina, area. The gang is known among police and others for its violence and intimidation.

Defendant Kilfoil is a Latin Kings member who serves as its "enforcer" or "muscle man." His job is to ensure that the gang's rules and regulations are followed. According to Watkins, former and current Latin Kings members have stated their fear of Kilfoil, and members of other area gangs, including the Surenos and MS-13, know him as an "enforcer" and a dangerous person. GPD officers know of Kilfoil's reputation for carrying weapons, particularly sharp objects, and Watkins had information to suggest that Kilfoil carried other weapons as well.

Officer Watkins is well-acquainted with Kilfoil, having interacted with him up to ten times prior to Kilfoil's May 13, 2009, arrest. Watkins first met Kilfoil in 2006 at the county jail when, along with other Latin Kings members, Kilfoil escalated his booking for assault by physically resisting officers and being verbally belligerent. Present during, and contributing to, this jail incident was Jorge Cornell

2

("Cornell"), the self-proclaimed "Great Inca," or leader, of the Greensboro Latin Kings.

In at least two of Watkins' several discussions with him, Kilfoil claimed he tried to kill his parents and expressed pride over his attempt. Watkins confirmed Kilfoil's claims through his interactions with other gang members in Greensboro, who reported the same. Based on his interviews of several others both within and without the Latin Kings, Watkins believed that Kilfoil was "crazy" and "violent." Prior to May 13, 2009, Watkins routinely checked Kilfoil's criminal record and made note of charges that were routinely added, including several threats, several aggravated assaults, assault with a deadly weapon, and robbery with a deadly weapon. Watkins and Sizemore were also aware that Kilfoil had been incarcerated for armed robbery, a felony.[1] Watkins testified that Kilfoil had in the past said that he would like to assault police officers, and GDP officers were aware that Kilfoil had in fact assaulted and made threats against police officers.

The Latin Kings congregated at 1309 Kirkman Street in Greensboro. Cara Williams, the owner, and her son Wesley Williams, lived in the house. Both are members of the Latin

---

[1]    The Government's brief notes that while the National Crime Information Center report, which is accessible to law enforcement, states a conviction for armed robbery, Kilfoil's Judgment and Commitment was for conspiracy to commit armed robbery. (Doc. 10 n.3.)

Kings. Gang members were known to stay at the house so frequently that it was known by officers as the Latin Kings' headquarters. GPD officers also knew that gang members kept firearms on the premises.

The GPD had been called to 1309 Kirkman Street in Greensboro multiple times.[2] For example, in March 2009, a pit bull kept on the premises escaped and attacked a neighborhood dog. A confrontation developed between GPD officers and members of the Latin Kings when animal control personnel tried to seize the dog from the house. At least seven officers, including Sigmon, were present in the front yard. Cornell held the pit bull and was preventing animal control officers from taking it. Kilfoil stood his ground at the perimeter of the front yard, assuming a boxer's stance, and held officers at bay. Whenever an officer approached, Kilfoil would turn his body toward the officer so as to keep himself between the officer and the dog.

In April 2008, Watkins responded to a serious assault of a Latin Kings member at the Kirkman Street house. Watkins described the victim as "beat up pretty bad."

Watkins also worked two cases of missing 14 and 15 year-old girls reported to have been taken in by the Latin Kings at the

---

[2]    When officers were dispatched, they were alerted that the Kirkman Street house was a gang location where officers had been confronted by gang members. The GPD maintained a database with information about known gang members, and all three testifying officers stated that it was common practice for officers to share such information.

4

Kirkman Street location.  On one occasion, Watkins had gone to the house looking for one of the juveniles, was told by a gang member she was not there, and was denied permission to enter. When Watkins later located the juvenile, she revealed that she had in fact been in the home when he inquired.  On the other occasion, the juvenile was found at the Kirkman Street house.

On the evening of May 12, 2009, GPD officers, including Sizemore, surveilled the Kirkman Street house based upon information that the Latin Kings were giving refuge to a missing juvenile male wanted on a secured custody order[3] as well as a felony charge.  Officers observed the juvenile but decided to arrest him in daylight out of concern that too many gang members were present to assure that the arrest could be made safely.

The next afternoon, on May 13, 2009, Sizemore and other officers again surveilled 1309 Kirkman Street for the missing juvenile.  Fewer individuals were around the house at that time. Based on a photograph, Sizemore observed the juvenile exit the house onto the porch several times, at one point to smoke what appeared to be a marijuana cigarette, and reenter the house. Shortly thereafter, Cornell arrived in an SUV.  The juvenile

---

[3]  A secured custody order requires law enforcement to detain the juvenile and return him to his parent or legal guardian.  It operates similarly to, and was characterized by officers as, an arrest warrant. See N.C. Gen. Stat. §§ 7B-1903 & 7B-1904 (2007).

5

again exited the house, accompanied by Kilfoil, and they sat on the porch, along with Cornell and Wesley Williams.

Officers determined that conditions were favorable for taking custody of the juvenile, and Watkins, Sigmon, and other officers approached the house. As they did so, Watkins, whose badge was displayed around his neck, commanded several times, in both English and Spanish, "Police. Do not move. Police. Do not move. Remain seated. Police. Do not move." Watkins gave this order because the house was a "hot spot,"[4] the Latin Kings (and specifically Cornell) were known to resist arrest (and Watkins was concerned Wesley Williams would as well), and Watkins wanted to neutralize the scene insofar as those on the porch, which was higher than the ground, were in a decidedly advantageous position relative to the officers.

All on the porch complied with Watkins' commands, except for Kilfoil. Rather, Kilfoil made eye contact with Watkins, ignored the commands, and bent over at the waist, quickly reaching toward his left ankle with his right hand. With this move, Watkins testified, he "knew something was wrong" and feared for the safety of the officers and others there.

Watkins again instructed Kilfoil not to move. Sigmon, who was assigned to arrest the juvenile, noticed Kilfoil's refusal to obey Watkins' commands and also directed Kilfoil to stop. He

---

[4] A "hot spot" is a location where violence was known to occur.

Case 1:09-cr-00271-TDS   Document 11   Filed 11/24/09   Page 6 of 21

did so, Sigmon testified, because he feared Kilfoil was going inside to get other gang members. Sigmon explained that on past occasions, such as the county jail confrontation, gang members have congregated in an attempt to surround officers as a means of intimidation. Sigmon also knew the gang was associated with weapons and was concerned that Kilfoil might be holding a weapon.

Kilfoil ignored Sigmon's commands as well, quickly stood up, and turned in a manner that blocked Watkins' view of Kilfoil's hands. As Kilfoil headed toward the front door of the house, Sigmon commanded him not to enter. By this time, Watkins was running toward Kilfoil and repeating commands to stop in English and Spanish. Kilfoil continued to ignore the officers' commands and entered the house, closing the door behind him.

Watkins was immediately behind Kilfoil and entered the residence within two or three seconds after Kilfoil closed the door. Watkins entered, he said, because, based upon information that the house contained firearms and Kilfoil's past use of weapons, he feared Kilfoil might get a weapon and use it against the police. Watkins also knew of Kilfoil's reputation for carrying weapons and could not see what, if anything, Kilfoil had reached for and held in his hands.

Once inside, Watkins instructed Kilfoil not to move. Ignoring Watkins still, Kilfoil reached toward his left

7

waistband, "like he was fixing to grab something." The two struggled. Watkins grabbed Kilfoil, assisted him to the ground, placed him under arrest, and handcuffed him. As Watkins helped him up, he told Kilfoil he was going to pat him down. Kilfoil twisted his body and urged Watkins, "don't go for it, man, leave it alone," stating that he was on probation and could not afford to go to prison. Watkins felt a hard object roll down Kilfoil's left pant leg, which Watkins discovered to be a 9mm Ruger semiautomatic pistol with an obliterated serial number, fully loaded with one round in the chamber.

Kilfoil was charged with resisting, delaying and obstructing an arrest (for ignoring police and entering the house), as well as the federal charge of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1).

## II.  ANALYSIS

Kilfoil moves to suppress the handgun on the grounds that GPD officers lacked probable cause to enter the residence and to arrest him. He further contends that there was no exigency of sufficient import to justify entry and, even if there was, any entry still required probable cause. The Government argues that, in their effort to take custody of the juvenile, officers were permitted to conduct a "protective sweep" under Maryland v. Buie, 494 U.S. 325 (1990), that included crossing the threshold

8

of the house based on a reasonable belief that Kilfoil posed a danger to the officers.

The Fourth Amendment ensures the people's right to be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A person's home is accorded a significant privacy interest under the Fourth Amendment and, absent an exception, the "threshold may not reasonably be crossed without a warrant." Payton v. New York, 445 U.S. 573, 590 (1980). As such, warrantless entries into a residence are presumptively unreasonable, and the Government bears the burden of rebutting that presumption. Welsh v. Wisconsin, 466 U.S. 740, 749-50 (1984); United States v. Mowatt, 513 F.3d 395, 399 (4th Cir. 2008).

Despite this broad admonition, a warrantless search is permissible under certain exceptions where the "'exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." Mincey v. Arizona, 437 U.S. 385, 394 (1978) (citing McDonald v. United States, 335 U.S. 451, 456 (1948), and Johnson v. United States, 333 U.S. 10, 14-15 (1948)); see Warden v. Hayden, 387 U.S. 294, 298-99 (1967) (holding that "[t]he Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would endanger their lives or the lives of others"). "Examples of exigent

9

circumstances include a 'risk of danger to the police or to other persons inside or outside the dwelling' . . . ." United States v. Moses, 540 F.3d 263, 270 (4th Cir. 2008) (citing Minnesota v. Olson, 495 U.S. 91, 100 (1990)).  Any such warrantless search, however, must be strictly tailored to the exigency that justifies it.  Mincey, 437 U.S. at 393.[5]

In Buie, the Supreme Court held that police officers, incident to an arrest, may conduct a precautionary protective sweep of areas "immediately adjoining the place of arrest from which an attack could be immediately launched," without probable cause or reasonable suspicion.  494 U.S. at 334.  In order to conduct a broader constitutionally permissible protective sweep, an officer must possess "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene."  Id.  Such protective sweeps stem from the concerns articulated in Terry v. Ohio, 392 U.S. 1 (1968), that officers are permitted to take reasonable steps "to assure themselves that the persons with whom they were dealing were not armed with, or able to gain immediate control of, a weapon that could unexpectedly and fatally be used against them."  Buie, 494

---

[5]  Other bases for exigency include destruction of evidence.  See, e.g., Mowatt, 513 F.3d at 399 (setting forth five-factor test).

U.S. at 333. Thus, a protective sweep may extend only to "a cursory inspection of those spaces where a person may be found" and may last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." Id. at 335-36.

Kilfoil does not directly challenge this analysis but rather argues that neither exigency nor danger permits an officer to cross the threshold of a residence without probable cause or a warrant. It is true that many cases that involve protective sweeps arise from sweeps within a home where officers are lawfully present to serve an arrest warrant. Neither party has cited a reported decision of the Fourth Circuit that extends a protective sweep across the threshold of a residence where an arrest is made outside the home. Cf. United States v. Bernard, 757 F.2d 1439 (4th Cir. 1985) (extending protective sweep to curtilage of defendant's property contemporaneous with questioning of defendant outside his home where officers had a reasonable fear of safety).

The Government relies on United States v. Vance, 53 F.3d 220 (8th Cir. 1995). There, police arrested defendant Vance outside his home without incident based on an outstanding warrant. 53 F.3d at 221. An agent had been informed prior to the arrest that Vance was "in the company of other felons, was

11

armed, and had stated that he would not return to prison." Id.
After Vance's arrest, a resident, Michael Sheid ("Sheid"),
appeared at the back door (wearing only his underwear) and, when
asked for identification, reentered the house. An officer
followed him inside, as did an FBI agent, who performed a
protective sweep. Id. In so doing, officers observed marijuana
in plain view and told Sheid that he wanted Vance's guns. Sheid
directed the officer to Vance's suitcase, which had been hidden
under Sheid's bed, where officers located two loaded revolvers
inside. Id.

Vance moved to suppress the two firearms, challenging both
the warrantless entry and the search. The district judge held
that the warrantless entry was justified as a protective sweep.
Id. The Eighth Circuit affirmed on other grounds, holding that,
"in view of the evolving circumstances, the warrantless entry
was justified to protect the safety of the officers." Id. The
court noted that "[l]aw enforcement officials may not cross that
line [the entrance to a house] without a search warrant or
exigent circumstances," the latter of which exist "when law
enforcement officials have a legitimate concern for the safety
of themselves or others." 53 F.3d at 222 (internal quotations
and citations omitted). The Eighth Circuit found that officers
had a reasonable fear for their safety based on articulated
concerns that others in the house possessed weapons, Sheid had

entered the house to obtain a weapon, and the house had not yet been secured. Id.

Though not noted by the parties, it appears well-established in the majority of circuits that the protective sweep exception, as defined in Buie, justifies entry into a residence where an arrest is made outside, even in the absence of a warrant or probable cause. See, e.g., Wilson v. Morgan, 477 F.3d 326, 337-39 (6th Cir. 2007) (finding, in context of claim under 42 U.S.C. § 1983, that United States v. Colbert, 76 F.3d 773, 776-78 (6th Cir. 1996), justifies protective sweep of home interior where arrest made outside); United States v. Maldonado, 472 F.3d 388, 394-95 (5th Cir. 2006) (upholding protective sweep of house where arrest made in driveway);[6] United States v. Paopao, 469 F.3d 760, 767 (9th Cir. 2006) (permitting protective sweep of apartment based on reasonable belief that at least one robber remained inside though arrest made outside); United States v. Lawlor, 406 F.3d 37, 41 (1st Cir. 2005) (noting that "an arrest that occurs just outside the home can pose an equally serious threat to arresting officer as one that occurs inside the home"); United States v. Cavely, 318 F.3d 987, 995-96 (10th Cir. 2003) (stating that, "[d]epending on the circumstances, the exigencies of a situation may make it

---

[6] See also United States v. Watson, 273 F.3d 599, 603 (5th Cir. 2001) (upholding protective sweep of house where arrest made on porch).

reasonable for officers to enter a home without a warrant in order to conduct a protective sweep"); United States v. Henry, 48 F.3d 1282, 1284 (D.C. Cir. 1995) (upholding protective sweep inside home where arrest made outside); United States v. Oguns, 921 F.2d 442, 446-47 (2d Cir. 1990) (allowing protective sweep of apartment where officers could have reasonably believed that people inside heard them arresting defendant outside); United States v. Delgado, 903 F.2d 1495, 1502 (11th Cir. 1990) (upholding protective sweep inside warehouse where reasonable belief existed as to danger to agents outside).

The conclusions of these circuits are consistent with those of two unreported Fourth Circuit cases upholding protective sweeps inside homes where arrests were made outside. See United States v. Hull, 239 F. App'x 809 (4th Cir. 2007) (affirming denial of motion to suppress where defendant was arrested outside home and officers conducted protective sweep inside); United States v. Chase, 1997 WL 657132, 127 F.3d 1100 (4th Cir. 1997) (finding officers' belief of potential danger reasonable, and search of interior of home constitutional, where defendant was arrested outside home and officers heard people moving around inside despite defendant's denial of presence of others). These conclusions are also consistent with Fourth Circuit explication of the Fourth Amendment. See generally Mora v. City of Gaithersburg, Md., 519 F.3d 216, 222, 224-25 (4th Cir. 2008)

14

(noting that, in discussing Terry and Buie, Fourth Amendment analysis is to be approached "with at least some measure of pragmatism" and "[i]f there is a grave public need for the police to take preventive action, the Constitution may impose limits, but it will not bar the way").

The Government argues, and Kilfoil does not dispute, that the secured custody order operated for all practical purposes as an arrest warrant insofar as it directed officers to seize the juvenile in question and return him to his parents or guardian. See supra note 3. The issue, then, is whether GPD officers were justified in conducting a protective sweep incident to the arrest of the juvenile. Whether the area just inside the front door where Kilfoil was arrested was "immediately adjoining" the porch where the custody order was executed (so as to dispense with any articulable suspicion requirement under Buie) is not determinative, as the court finds that officers possessed a reasonable belief, based on specific and articulable facts, that the area swept harbored an individual posing a danger to the officers or others.

The Kirkman Street house was long known to be frequented by members of the Latin Kings, a gang reputed for its violence, intimidation, and possession of weapons. At least two of the officers approaching the house -- Watkins and Sigmon -- had past, personal experiences with Cornell and Kilfoil acting

15

aggressively toward police and resisting or obstructing an arrest. Both knew that Kilfoil had a history of possessing dangerous weapons and a proclivity toward violence. Kilfoil's behavior on May 13, 2009, gave officers specific reasons to reasonably believe he was posing a danger to them. Both had reason to suspect that Kilfoil had a weapon he was trying to conceal, and both feared, based on past experiences with these gang members, that Kilfoil may have been going inside to procure a weapon or enlist additional gang members as back-up. The danger to the officers was palpable and immediate.

There was also urgency to the officers' actions. It would have been wholly insufficient and unreasonable to have required officers to wait and obtain a warrant to enter the house. Officers were in the middle of conducting an arrest of a juvenile from the gang's premises with knowledge of deception and resistance in detaining another juvenile previously. The scene was unfolding in real time, and the facts reasonably raised the specter of danger in several ways, including: Kilfoil using a weapon on his person from the vantage point of the house; his obtaining a weapon from the house to use against the officers; and/or his recruiting more gang members to outnumber the officers.

The officers' actions were also narrowly tailored to the threat of danger. Their concern was whether Kilfoil was armed

16

and whether he was seeking to recruit other gang members or obtain a weapon by entering the gang house. Watkins pursued Kilfoil only to the area just inside the front door and only for the purpose of neutralizing him. He went no further.[7]

Kilfoil argues that officers had no need to enter the residence and should have departed once they conducted the custody seizure on the porch. Neither the doctrine of protective sweeps nor that of exigent circumstances, however, requires that law enforcement officers ignore possible threats simply because they have made, or can make, their arrest. Indeed, Buie expressly rejected such an argument by permitting a protective sweep *after* the defendant's arrest in order to assure officer safety. 494 U.S. at 334; accord Vance, 53 F.3d at 222 n.4 (stating that "[l]aw enforcement officers are not required to avoid danger" and did not have to ignore the resident's presence simply because they had made their arrest).

Here, the GPD officers were in the process of serving the custody order when Kilfoil fled into the residence, and officers did not have to ignore Kilfoil's retreat simply because the juvenile could have been taken into custody on the porch. The test is an objective one. Terry, 392 U.S. at 21-22; cf. Henry, 48 F.3d at 1284 ("That the police arrested the defendant outside

---

[7]    Whether officers would have been justified in conducting a protective sweep further into the home need not be considered on this record.

17

rather than inside his dwelling is relevant [only] to the question of whether they could reasonably fear an attack by someone within it."). Whether officers in fact departed without incident is a 20/20 hindsight determination that ignores the very purpose of the protective sweep doctrine, and nothing in Fourth Amendment case law requires officers to submit to such after-the-fact second-guessing. Mora, 519 F.3d at 224-25 (noting that "[i]n circumstances that suggest a grave threat and true emergency, law enforcement is entitled to take whatever preventive action is needed to defuse it," and such actions are accorded "due deference for the difference in perspective between an officer who must make snap judgments in minutes or seconds, and a judge who has 'the 20/20 vision of hindsight'") (citation omitted).

Kilfoil also argues that United States v. Burton, 228 F.3d 524 (4th Cir. 2000), prohibited officers from following and detaining him. Burton, however, is distinguishable. In Burton, the defendant was standing by a pay phone outside a mini-mart when four police officers, serving outstanding warrants, approached. 228 F.3d at 526. The defendant did not respond to officers' repeated requests for identification and for the defendant to remove his hand from his coat pocket. Feeling uneasy, an officer moved behind the defendant and reached his hand inside the defendant's coat pocket, resulting in a struggle

18

and the seizure of a firearm from the defendant. Id. The Fourth Circuit concluded that this search and subsequent seizure violated the Fourth Amendment because the incident was a police-citizen encounter where officers lacked an articulable basis indicating criminal activity to justify conducting a protective search. Id. at 528. The Fourth Circuit concluded that the defendant's failure to cooperate, "without more, does not furnish the minimal level of objective justification needed for detention or seizure." Id. at 529 (quoting Florida v. Bostick, 501 U.S. 429, 437 (1991)).

Burton was concededly a "routine 'police-citizen encounter.'" Id. at 527. The present case, by contrast, involved a protective sweep in connection with the execution of a secured custody order. Unlike Burton, GDP officers had constitutional grounds to insist on the encounter as they executed the secured custody order on the juvenile whom the gang members were harboring. In accordance with the protective sweep doctrine, officers were justified in preserving the status quo to permit the arrest to be carried out safely. Cf. Brendlin v. California, 551 U.S. 249, 258 (2007) (finding it reasonable that an officer "at the scene of a crime, arrest, or investigation will not let people move around in ways that could jeopardize his safety"); Maryland v. Wilson, 519 U.S. 408, 414-15 (1997) (upholding law enforcement's right to detain and order even

19

passengers out of automobile); <u>Michigan v. Summers</u>, 452 U.S. 692, 705 (1981) (holding that routine detention of residents is permitted when executing search warrant of home).

Kilfoil's actions gave rise to reasonable articulable suspicion that officer safety was at risk. Whereas officers knew nothing of Burton, <u>id.</u> at 528, GPD officers not only had particularized knowledge about Kilfoil's dangerousness and propensity to carry weapons, they observed Kilfoil engage in suspicious activity consistent with reaching for, and concealing, a weapon. Further, in serving the custody order, the GPD officers knew that the Latin Kings had a history of resisting the arrest of its members, including juveniles, not only generally, but at that particular location. Thus, the police encountered Kilfoil in a context which posed a heightened risk of generating an altercation than a casual approach on the street.[8]

---

[8] Officer Watkins testified that Kilfoil's departure from the porch itself constituted the crime of "resist, obstruct and delay" of their execution of the secured custody order sufficient to pursue him into the residence. <u>See</u> N.C. Gen. Stat. § 14-223 (2007); <u>State v. Washington</u>, 668 S.E.2d 622, 627-28 (N.C. App. 2008) (enumerating the elements of a § 14-223 offense and noting the offense applies to "any resistance, delay, or obstruction of an officer in the discharge of his duties"). In light of the court's decision, it need not consider whether entry into the Kirkman Street residence was justified under a "hot pursuit" theory. <u>See</u> <u>United State v. Jones</u>, 204 F.3d 541, 543 (4th Cir. 2000).

## III. CONCLUSION

The court has carefully considered Kilfoil's arguments in support of his motion to suppress. For the reasons set forth above,

IT IS ORDERED that Kilfoil's motion to suppress (Doc. 9) is DENIED.

_____/s/ Thomas D. Schroeder<br>
United States District Judge

November 23, 2009